**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2019

(Argued: February 28, 2020          Decided: July 8, 2020
Amended: July 9, 2020)

No. 19-781

_____

In Re: Application and Petition of Hanwei Guo for an Order to take Discovery
for Use in a Foreign Proceeding Pursuant to 28 U.S.C. 1782
_____

HANWEI GUO,

*Petitioner-Appellant,*

v.

DEUTSCHE BANK SECURITIES INC., J.P. MORGAN SECURITIES LLC, MERRILL LYNCH,
PIERCE, FENNER & SMITH INCORPORATED, MORGAN STANLEY & CO. LLC,

*Respondents-Appellees,*

CHINA PUBLISHING CORPORATION, OCEAN INTERACTIVE (BEIJING) TECHNOLOGY
CO., LTD., TENCENT MUSIC (BEIJING) CO., LTD., OCEAN INTERACTIVE (BEIJING)
CULTURE CO., LTD., TENCENT MUSIC ENTERTAINMENT GROUP, AKA CHINA MUSIC
CORPORATION,

*Intervenors-Appellees.*
_____

Before:    LIVINGSTON and PARK, *Circuit Judges*, and UNDERHILL, *District Judge*.[1]

Petitioner-Appellant Hanwei Guo seeks discovery under 28 U.S.C. § 1782 for use in an arbitration taking place abroad.   He argues that our previous decision in *National Broadcasting Co. v. Bear Stearns & Co.*, 165 F.3d 184 (2d Cir. 1999), which held that private commercial arbitrations are not within § 1782(a)'s "foreign or international tribunal" requirement, is no longer good law in light of the Supreme Court's decision in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004).   For the reasons explained below, we disagree and, applying *NBC*, find that the arbitration at issue here is a private commercial arbitration outside the scope of § 1782.   Accordingly, we AFFIRM the district court's denial of the petition.

FOR PETITIONER-APPELLANT:          RENITA SHARMA, Peter E. Calamari, Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY.

FOR INTERVENORS-APPELLEES:          FRANCES E. BIVENS, Jonathan K. Chang, Peter M. Bozzo, Davis Polk & Wardwell, LLP, New York, NY.

FOR RESPONDENTS-APPELLEES:          Pamela A. Miller, Allen W. Burton, Gerard A. Savaresse, O'Melveny & Myers LLP, New York, NY.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

28 U.S.C. § 1782(a) authorizes federal courts to compel the production of materials "for use in a proceeding in a foreign or international tribunal" upon "the

---

[1]  Chief Judge Stefan R. Underhill, of the United States District Court for the District of Connecticut, sitting by designation.

2

application of any interested person." In *National Broadcasting Co. v. Bear Stearns & Co.*, 165 F.3d 184 (2d Cir. 1999) ("*NBC*"), this Court held that the phrase "foreign or international tribunal" does not encompass "arbitral bod[ies] established by private parties," *id.* at 191. Petitioner-Appellant Hanwei Guo ("Guo") asks us to revisit this holding in light of a subsequent decision of the Supreme Court. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004) ("*Intel*"). Because nothing in the Supreme Court's *Intel* decision alters our prior conclusion in *NBC* that § 1782(a) does not extend to private international commercial arbitrations, and because the arbitration at issue here is a non-covered, private, international commercial arbitration, we AFFIRM the district court's denial of the petition.

## BACKGROUND

### I.

From 2012 to 2013, Petitioner-Appellant Hanwei Guo invested nearly CNY 180 million (approximately $26 million) in companies known as Ocean Technology, Ocean Music, and Ocean Culture ("Ocean Entities"), founded by a music executive and lawyer named Guomin Xie ("Xie"). These businesses operated in the Chinese music streaming market. Xie was the head of the Ocean Entities and China Music Corporation, a holding company allegedly created to

3

facilitate the Ocean Entities' access to foreign equity markets. Through a series of transactions that Guo asserts were misleading, extortionate, and fraudulent, Guo sold his shares in the Ocean Entities for less than they were allegedly worth. Eventually, following a series of mergers, Ocean Music became part of Tencent Music, by some metrics one of the largest music streaming services in the world.

In September 2018, shortly before Tencent Music conducted its American IPO and pursuant to agreements among Guo, Xie, and others, Guo initiated arbitration against Xie, Tencent Music, and several other entities before the China International Economic and Trade Arbitration Commission ("CIETAC"). Guo claimed that Xie and the other respondents had defrauded him and that he was entitled to be paid compensation and to have his equity stake restored. Subsequently, at least one respondent filed counterclaims, and the parties selected an arbitral panel in April 2019. The matter remains pending, with a hearing before the arbitral panel scheduled to proceed on July 21, 2020.

## II.

According to declarations submitted by the parties, CIETAC was established by the People's Republic of China in 1954 as part of the China Council for the Promotion of International Trade ("CCPIT"). CIETAC's administrative

leadership is appointed by the CCPIT, although the arbitrators who preside over any given case are selected by the parties from a list that is compiled by CIETAC without CCPIT involvement. Potential arbitrators are not required to have any ties to the Chinese government or to undergo screening by any entity other than CIETAC, although Chinese arbitration law does set certain minimum qualifications for arbitrators. CIETAC arbitrations are confidential both during the proceedings and after their completion. Both CIETAC and CCPIT receive at least some funding from the Chinese government.

CIETAC's jurisdiction is restricted to disputes between private parties who have elected CIETAC arbitration through contractual agreement, as well as certain contractual disputes arising between investors and Chinese governmental entities. CIETAC has promulgated two different sets of rules to govern these two varieties of arbitration. This case, as a dispute among private parties, is governed by the rules set out by CIETAC for private arbitration. Under this ruleset, CIETAC's jurisdiction over any particular matter depends entirely on the agreement of the parties.

In any given arbitration, CIETAC operates independently of the Chinese government, with CIETAC arbitrators having the power to issue awards that

5

Chinese law will recognize as "final and binding." Joint App'x 683. Chinese arbitration law, however, provides for certain circumstances in which awards may be set aside as contrary to Chinese law, such as situations involving fraud or bribery of arbitrators or instances in which there was an initial lack of an agreement to arbitrate.

As part of the arbitration process, CIETAC rules provide for discovery, including a mechanism by which the arbitration panel may order parties to produce evidence.

## III.

In December 2018, Guo filed this petition for discovery pursuant to 28 U.S.C. § 1782(a) in the United States District Court for the Southern District of New York (Furman, *J.*). Guo sought discovery from four investment banks, the Respondents-Appellees here, related to their work as underwriters in the Tencent Music IPO.[2] Guo alleged that he intended to use the documents in his pending CIETAC arbitration against Xie and the Ocean Entities. Intervenors-Appellees China Publishing Corporation, Ocean Interactive (Beijing) Technology Co., Ltd.,

---

[2] The banks targeted by Guo's application are Deutsche Bank Securities Inc.; J.P. Morgan Securities LLC; Merrill Lynch, Pierce, Fenner & Smith Incorporated; and Morgan Stanley & Co. LLC.

Tencent Music (Beijing) Co., Ltd., Ocean Interactive (Beijing) Culture Co., Ltd., and Tencent Music Entertainment Group, A.K.A. China Music Corporation intervened below to oppose the petition. The district court denied Guo's application on February 25, 2019. *In re Application of Hanwei Guo for an Order to Take Discovery for Use in a Foreign Proceeding Pursuant to 28 U.S.C. § 1782*, No. 18-MC-561 (JMF), 2019 WL 917076, at *3 (S.D.N.Y. Feb. 25, 2019). The court's determination was based on its conclusions that (1) *NBC* remained good law in the wake of the Supreme Court's decision in *Intel*, such that the district court was bound by the Second Circuit's prior determination that § 1782(a) does not apply to private arbitration; and (2) CIETAC was "closer to a private arbitral body than it is to a 'governmental . . . tribunal[]' or 'other state-sponsored adjudicatory bod[y],'" such that Guo's application was foreclosed by *NBC*. *Id.* at *2–3 (quoting *NBC*, 165 F.3d at 190).

Guo timely appealed, challenging both aspects of the district court's holding. On appeal, Guo contends that private arbitrations are within the scope of § 1782(a) and that, even if they were not, the CIETAC arbitration qualifies as an arbitration under a state-sponsored adjudicatory body.

7

## DISCUSSION

The two questions on appeal are whether private international commercial arbitrations are proceedings for which § 1782 may be invoked and, if not, whether CIETAC arbitration is a private arbitration and therefore outside the scope of § 1782.

## I.

28 U.S.C. § 1782 provides for "federal-court assistance in gathering evidence for use in foreign tribunals." *Intel*, 542 U.S. at 247. Upon the "application of any interested person," a district court may, in its discretion, "order [a person] to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation." 28 U.S.C. § 1782(a).

The statute imposes several mandatory requirements for a § 1782 application, including that "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign [or international] tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir. 2015)

8

(quoting *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012)).[3]   This Court reviews the district court's ruling "that a petition satisfies [§] 1782's jurisdictional [i.e. statutory] requirements" *de novo*.   *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 243 (2d Cir. 2018).   If the statutory preconditions are met, district courts exercise discretion to determine whether and to what extent the requested discovery should be permitted, guided by a set of factors outlined by the Supreme Court in *Intel*.   *See Mees*, 793 F.3d at 297–98 (citing *Intel*, 542 U.S. at 264–65).

This Court has previously analyzed the contours of the statute's "foreign or international tribunal" requirement with respect to arbitration.   In *NBC*, we considered whether a "private commercial arbitration administered by the International Chamber of Commerce ('ICC'), a private organization based in Paris, France" was a "proceeding in a foreign or international tribunal" for purposes of § 1782(a).   165 F.3d at 186.   We held that it was not.   *Id.* at 191.

Our decision in *NBC* concluded that: (1) the statutory text, namely the phrase "foreign or international tribunal," was ambiguous as to the inclusion of

---

[3] While our case law has often focused on these three elements, the statute also imposes other requirements, including that the discovery not be "in violation of any legally applicable privilege."   28 U.S.C. § 1782(a).

private arbitrations; (2) the legislative and statutory history of the insertion of the phrase "foreign or international tribunal" into § 1782(a) demonstrated that the statute did not apply to private arbitration; and (3) a contrary reading would impair the efficient and expeditious conduct of arbitrations. *Id*. at 188–91. Following its threshold finding of ambiguity, *id.* at 188, the Court turned to statutory and legislative history, first determining that the phrase "foreign or international tribunal" had been introduced into the statute for the purpose of expanding the original formulation, which provided for assistance only with respect to "judicial proceeding[s] in any *court* in a foreign country." *Id.* at 189 & n.4 (quoting 28 U.S.C. § 1782 (1958) (emphasis added by *NBC*)). Notwithstanding this expanding purpose, the Court's careful examination of House and Senate reports indicated that the enacting Congress did not intend for the statute to reach as far as private arbitration, given the explicit discussion in the reports of the collection of evidence for use "before a foreign administrative tribunal or quasi-judicial agency" and the absence of any reference to private dispute resolution. *Id.* at 189 (first citing H.R. Rep. No. 88-1052, at 9 (1963) ("House Report"); then citing S. Rep. No. 88-1580 (1964), *reprinted in* 1964 U.S.C.C.A.N. 3782, 3788 ("Senate Report")).

10

The Court also found compelling the legislative history surrounding the replacement by the new § 1782 of several statutory provisions previously codified at 22 U.S.C. §§ 270–270g. The phrase "international tribunal" in the new statute derived directly from §§ 270–270g—provisions that without "question . . . applied only to intergovernmental tribunals." *Id.* at 189. House and Senate reports indicated that the new § 1782 was intended to expand the scope of the prior statute to encompass intergovernmental tribunals in which the United States was not a party, but fell far short of conveying any intention to effect the much more dramatic expansion into private arbitration. *Id.* at 190 (citing Senate Report at 3784–85, 3788–89). The Court further noted that contemporaneous academic literature relied upon by Congress supported the position that the "tribunals" in § 1782 referred particularly to intergovernmental arbitration and other state-sponsored dispute resolution mechanisms. *Id.* at 190 (citing Hans Smit, *Assistance Rendered by the United States in Proceedings Before International Tribunals*, 62 Colum. L. Rev. 1264, 1267 (1962)). On this basis, alongside policy considerations weighing strongly in favor of preserving the efficiency and cost-effectiveness of private arbitration, the Court concluded that private arbitrations do not qualify as "foreign or international tribunal[s]" within the meaning of § 1782(a). *Id.* at 191.

11

Shortly after our decision in *NBC*, the Fifth Circuit followed suit in *Republic of Kazakhstan v. Biedermann International*, 168 F.3d 880 (5th Cir. 1999) ("*Biedermann*"). Based on its own analysis of legislative history, the near-uniform limitation of references to "arbitral tribunals" within the U.S. Code to adjuncts of foreign governments or international agencies, and policy considerations, the Fifth Circuit joined the Second Circuit in holding that § 1782 does not apply to private international arbitrations. *Id.* at 881–83.

Five years after *NBC*, the Supreme Court issued its seminal decision in *Intel*—the only Supreme Court case to address § 1782. *Intel* clarified numerous aspects of the statute, holding that non-litigants may be "interested person[s]," 542 U.S. at 256–57; that a proceeding need only be "within reasonable contemplation," rather than "imminent"—expressly overruling Second Circuit precedent to the contrary, *id.* at 258–59; and that the statute contains no implicit "foreign-discoverability requirement," *id.* at 260–63. Most relevant here, the Court also considered whether the Directorate General-Competition of the Commission of the European Communities, a public entity, constitutes a "tribunal" under § 1782. *See id.* at 257–58. Adopting a functional approach, the Court held that that Directorate General-Competition, as a "quasi-judicial agenc[y]" with a proof-

12

gathering function, qualifies as a tribunal "to the extent that it acts as a first-instance decisionmaker," with its decisions reviewed by the Court of First Instance and the European Court of Justice (both of which were clearly "tribunals"). *Id.* The distinct question resolved by *NBC*—whether a private international arbitration tribunal qualifies as a "tribunal" under § 1782—was not before the *Intel* Court.

Following *Intel*, courts have taken diverging approaches to the question of whether private foreign arbitrations fall within the scope of § 1782. The Fifth Circuit, for its part, reaffirmed its holding in *Biedermann*, reasoning in a non-precedential opinion that *Intel* had no effect on its prior analysis. *El Paso Corp. v. La Comision Ejecutiva Hidroelectrica Del Rio Lempa*, 341 F. App'x 31, 33–34 (5th Cir. 2009). By contrast, two circuits considering the question for the first time reached the opposite conclusion than that originally reached by the Second and Fifth Circuits. In *In re Application to Obtain Discovery for Use in Foreign Proceedings*, 939 F.3d 710 (6th Cir. 2019), the Sixth Circuit held that § 1782 applies to private arbitrations, based on its analysis of the statutory text, context, and history, *id.* at 714. The Sixth Circuit acknowledged that its holding was inconsistent with our decision in *NBC*, explaining that it found the Second Circuit's statutory

13

interpretation analysis unpersuasive. *Id.* at 726–28. The Sixth Circuit's opinion did not suggest, however, that *Intel* overruled or otherwise undermined *NBC*, or that *Intel* compelled the outcome in its case; rather, the court reasoned that its decision was merely *consistent* with the Supreme Court's decision because "the *Intel* Court said nothing that would make [the court] doubt the outcome of [its] textual analysis" and "*Intel* contains no limiting principle suggesting that" the word "tribunal" should be read to exclude private arbitration. *Id.* at 725–26.

Recently, the Fourth Circuit also addressed the question, holding that § 1782 extends to private arbitration in the United Kingdom ("U.K."). *See Servotronics, Inc. v. Boeing Co.*, 954 F.3d 209, 210 (4th Cir. 2020). The Fourth Circuit based its ruling on the determination that arbitration in the U.K. under the U.K. Arbitration Act of 1996, like arbitration in the United States under the Federal Arbitration Act ("FAA"), is "clearly" a "product of government-conferred authority," and that therefore the U.K. arbitration at issue in the case fell within the scope of § 1782 even under the construction adopted by the Second and Fifth Circuits, which limited § 1782 to tribunals "acting with the authority of the State." *Id.* at 214 (internal quotation marks omitted). Thus, as with the Sixth Circuit's opinion, no part of the Fourth Circuit's opinion rested on the notion that *Intel* undermined

14

*NBC* or otherwise required a reading of § 1782 that encompasses private arbitration.[4]

Meanwhile, district courts within the Second Circuit have split on the question whether *NBC* remains intact post-*Intel*. *Compare, e.g., In re Children's Inv. Fund Found. (U.K.)*, 363 F. Supp. 3d 361, 369–70 (S.D.N.Y. 2019), *with, e.g., In re Petrobras Sec. Litig.*, 393 F. Supp. 3d 376, 385 (S.D.N.Y. 2019). We now clarify that *NBC* remains binding law in this Circuit.

**II.**

Contrary to Guo's insistence that *NBC* has been overruled or otherwise undermined by the Supreme Court's decision in *Intel*, we conclude that *NBC*'s holding remains good law. "It is a longstanding rule of our Circuit that a three-judge panel is bound by a prior panel's decision until it is overruled either by this Court sitting *en banc* or by the Supreme Court." *Doscher v. Sea Port Grp. Sec., LLC*,

---

[4] The Eleventh Circuit has also considered the question whether a private arbitration qualifies as a tribunal under § 1782, initially holding that the private arbitration in question came within the scope of § 1782 under the Supreme Court's functional analysis in *Intel*; however, the court ultimately withdrew that decision and issued a new opinion that took no position on the question. *See Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 685 F.3d 987, 993–98 (11th Cir. 2012), *vacated and superseded by Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA) Inc.*, 747 F.3d 1262, 1270 n.4 (11th Cir. 2014) ("leav[ing] the resolution of the matter for another day").

832 F.3d 372, 378 (2d Cir. 2016).   The Supreme Court "need not address the precise issue decided by the panel," *In re Zarnel*, 619 F.3d 156, 168 (2d Cir. 2010); however, in order to qualify as an intervening decision that casts sufficient doubt upon a prior ruling as to render it non-binding, "the Supreme Court's conclusion in a particular case must have broken the link on which we premised our prior decision or undermined an assumption of that decision," *Doscher*, 832 F.3d at 378 (internal quotation marks, alterations, and citations omitted).   "If a panel concludes that a particular Supreme Court decision does not cast sufficient doubt on our precedent, the precedent continues to be binding."   *Doscher*, 832 F.3d at 378.

Intel does not cast "sufficient doubt" on the reasoning or holding of *NBC*. *Id.*   Critically, the question whether foreign private arbitral bodies qualify as tribunals under § 1782(a) was not before the *Intel* Court, which considered only whether the Directorate General-Competition, a public entity, qualified as such a tribunal.   The only language in *Intel* that is even arguably in tension with *NBC*'s determination that the statute is limited to state-sponsored tribunals is a passing reference in dicta:   namely, a parenthetical quotation of a footnote in an article by Professor Hans Smit, setting forth the proposition that "[t]he term 'tribunal' . . .

16

includes investigating magistrates, administrative and *arbitral tribunals*, and quasi-judicial agencies, as well as conventional civil, commercial, criminal, and administrative courts." 542 U.S. at 258 (emphasis added) (quoting Hans Smit, *International Litigation Under the United States Code*, 65 Colum. L. Rev. 1015, 1026 n.71 (1965)). We doubt whether such a fleeting reference in dicta could ever sufficiently undermine a prior opinion of this Court as to deprive it of precedential force. Indeed, even the Sixth Circuit, in reaching an outcome contrary to *NBC*, refused to ascribe such significance to the language in question. *See In re Application*, 939 F.3d at 725 n.9 (determining only that "the Supreme Court's approving quotation of the Smit article . . . provides no affirmative support" for a reading of the statute that *excludes* private arbitration).

Moreover, even assuming that cursory dicta could have the effect of abrogating our precedent, the language quoted by *Intel* had no such impact, as it is not definitively at odds with *NBC*. Professor Smit's reference to "arbitral tribunals" does not necessarily encompass private tribunals, particularly in light of his view, expressed in a 1962 article cited in *NBC*, that "an international tribunal owes both its existence and its powers to an international agreement." Hans Smit, *Assistance Rendered by the United States in Proceedings Before International*

17

*Tribunals*, 62 Colum. L. Rev. 1264, 1267 (1962); *see also NBC*, 165 F.3d at 189.    *Intel*'s

indirect reference to "arbitral tribunals" can thus be read consistently with *NBC* as

referring solely to state-sponsored arbitral bodies.    At bottom, *Intel*'s reference to

Professor Smit's article casts no doubt upon our analysis in *NBC*.[5]

Nor, as Guo argues, does *Intel*'s discussion of § 1782's legislative history and

general principles of statutory construction undermine our prior decision.    As to

legislative history, *Intel* considered some of the same congressional reports

analyzed in *NBC*, concluding that the statute's introduction of the word "tribunal"

was intended to expand the types of proceedings in which assistance would be

available.    *See* 542 U.S. at 248–49 (first citing Senate Report at 3788; then citing

House Report at 9).    *NBC* is in accord: the opinion explicitly acknowledged that

---

[5] We are likewise unconvinced by Professor Smit's subsequent scholarship claiming that § 1782 should be read to include private as well as governmental arbitration, which is extensively relied upon by Guo on appeal.    *See* Appellant's Br. at 28–31 (citing Hans Smit, *The Supreme Court Rules on the Proper Interpretation of Section 1782: Its Potential Significance for International Arbitration*, 14 Am. Rev. Int'l Arb. 295 (2003)).    As we previously explained in *NBC*, while Congress specifically relied on Professor Smit's 1962 article in formulating the statute and that article was therefore particularly probative of the statute's meaning, his subsequent scholarship, which was penned decades later and adopted a stance that is seemingly inconsistent with the 1962 article, "does not purport to rely upon any special knowledge concerning legislative intent" and therefore does not share the unique status of his earlier work.    *NBC*, 165 F.3d at 190 & n.6.    Guo has identified no aspect of Professor Smit's 2003 article that persuades us that *Intel* requires us to set aside our prior case law.

Congress drafted the provision in question with an intent to expand the scope of coverage. *See* 165 F.3d at 189. The fact that *NBC* went on to determine that this expanding function did not extend so far as to incorporate private arbitration—a question that the *Intel* Court had no occasion to consider—does not render *NBC*'s treatment of legislative history incompatible with that of *Intel*. Contrary to Guo's contention on appeal, *NBC*'s refusal to read such a sweeping expansion into the statute in the absence of clear statutory language or any indication of congressional intent is consistent with *Intel*'s observation, in rejecting a foreign-discoverability requirement, that "[i]f Congress had intended to impose such a sweeping restriction on the district court's discretion, at a time when it was enacting liberalizing amendments to the statute, it would have included statutory language to that effect." 542 U.S. at 260 (quoting *In re Application of Gianoli Aldunate*, 3 F.3d 54, 59 (2d Cir. 1993)). Ultimately, *Intel*'s approach to interpreting § 1782, including its emphasis on the primacy of plain textual meaning, is based on general principles of statutory construction that cast no doubt on our precedent. *NBC*'s thorough analysis, which began with a threshold finding of ambiguity before turning to legislative history and purpose to elucidate the meaning of the statutory language, comports with both *Intel*'s reiteration of broad principles and

19

its specific analysis of § 1782.[6]

Having thus concluded that we remain bound by *NBC*, we turn to the question whether the CIETAC arbitration qualifies as a private international commercial arbitration, thereby falling outside the scope of § 1782.

**III.**

The district court correctly concluded that the CIETAC arbitration is a private international commercial arbitration outside the scope of § 1782(a)'s "proceeding in a foreign or international tribunal" requirement.

*NBC* made clear that "international arbitral panels created exclusively by private parties" are not "foreign or international tribunals" within the meaning of § 1782. 165 F.3d at 190. A closer inquiry is required where, as here, the arbitral

---

[6] Moreover, we are unpersuaded by the argument that *Intel* adopted a functional approach to the meaning of "tribunal" that supplants our statutory analysis in *NBC*. While not specifically advanced by Guo on appeal, this line of reasoning surfaces in some of the out-of-circuit district court decisions cited by Guo. *See, e.g., In re Roz Trading Ltd.*, 469 F. Supp. 2d 1221, 1228 (N.D. Ga. 2006). The argument is meritless. While *Intel* analyzed the functions of the Directorate General-Competition for the purposes of determining whether that body qualified as a tribunal, it had no occasion to first consider the threshold question we confronted in *NBC*: namely, whether a wholly private entity can constitute a tribunal under § 1782. Nothing in *Intel* indicates that a functional test displaces ordinary statutory interpretation for purposes of that threshold determination. Indeed, such an approach would be untenable, as innumerable entities could satisfy the functional criteria of a "tribunal" referenced in *Intel*, while nevertheless clearly falling outside the scope of a "foreign or international tribunal" under the statute—for example, any *domestic* court.

20

body was originally created through state action, yet subsequently evolved such that it arguably no longer qualifies as a "governmental or intergovernmental arbitral tribunal[,] . . . conventional court[, or] . . . other state-sponsored adjudicatory bod[y]." *Id*. We now clarify that the "foreign or international tribunal" inquiry does not turn on the governmental or nongovernmental *origins* of the administrative entity in question. No single factor clearly distinguishes a private international commercial arbitration from a state-sponsored one. Rather, echoing the functional approach adopted by the *Intel* court in determining whether the Directorate General-Competition qualified as a tribunal, *see* 542 U.S. at 257–58, we consider a range of factors, including the degree of state affiliation and functional independence possessed by the entity, as well as the degree to which the parties' contract controls the panel's jurisdiction. In short, the inquiry is whether the body in question possesses the functional attributes most commonly associated with private arbitration. Here, considering these factors, it is clear that CIETAC arbitrations are private international commercial arbitrations falling outside the ambit of § 1782.

Beginning with state affiliation, our focus is on the extent to which the arbitral body is internally directed and governed by a foreign state or

21

intergovernmental body. CIETAC was, all parties agree, originally founded by the Chinese government. CIETAC now, however, functions essentially independently of the Chinese government in the "administration of its arbitration cases." Joint App'x 682. According to the parties' declarations, CIETAC maintains confidentiality from all non-participants during and after arbitration, limiting opportunities for *ex parte* intervention by state officials. CIETAC offers parties a pool of arbitrators who are not selected by any entity other than CIETAC and who do not purport to act on behalf of, or have any mandatory affiliation with, the Chinese government. Indeed, the arbitrators appear to come from many different backgrounds and nations. These facts suggest that CIETAC possesses a high degree of independence and autonomy, and, conversely, a low degree of state affiliation.

We next consider the degree to which a state possesses the authority to intervene to alter the outcome of an arbitration after the panel has rendered a decision. Here, the limited review provided to parties to CIETAC arbitrations in Chinese courts and the role of the Chinese government in enforcing awards are not enough to render CIETAC a "foreign or international tribunal." As an initial matter, the grounds for setting aside an arbitration under Chinese law cited by

22

Guo overlap extensively with the grounds upon which a party could petition a U.S. court to set aside an arbitration award, including a lack of agreement to arbitrate, the scope of the matters to be arbitrated, improper appointment of arbitrators, and fraud or bribery by the arbitrators or parties. *See* 9 U.S.C. §§ 2, 3, 4, 5. And neither party points to any evidence that the Chinese government has any other basis to intervene in arbitrations other than those cited by Guo. Because the provisions of Chinese law relied on by Guo merely control the enforceability of arbitrations in China in almost the same manner and to the same extent as the FAA in the United States, they do not convert CIETAC arbitrations into state-sponsored endeavors. Furthermore, the fact that parties to the arbitration in some cases rely on Chinese courts to enforce the "final and binding" arbitration awards is of no import. Joint App'x 683. Otherwise, given that governments around the world commit to enforcing arbitration awards in their courts under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), the majority of arbitration which takes place abroad would fall within the scope of § 1782, erasing the distinction drawn by *NBC*. *See* 9 U.S.C. §§ 2, 9; *NBC*, 165 F.3d at 187 (discussing the New York Convention). The fact that CIETAC panels may ultimately rely on the

authority of China to enforce their decisions does not mean that CIETAC arbitration panels are public entities, any more than a corporation becomes a public entity because of its reliance on a given state's commitment to enforce its contracts or uphold its charter.

Turning to the nature of the jurisdiction possessed by the panel, the CIETAC panel derives its jurisdiction exclusively from the agreement of the parties and has no jurisdiction except by the parties' consent. By contrast, state-affiliated tribunals often possess some degree of government-backed jurisdiction that one party may invoke even absent the other's consent. Because CIETAC's jurisdiction flows exclusively from the parties and not any governmental grant of authority, CIETAC more closely resembles a private arbitration.[7]

---

[7] For the same reasons, we are unpersuaded by Guo's argument that CIETAC most closely resembles arbitration under bilateral investment treaties. While an arbitral body under a bilateral investment treaty may be a "foreign or international tribunal," the arbitration here derives adjudicatory authority solely from the parties' agreement, rather than the intervention or license of any government to adjudicate cases arising from certain varieties of foreign investment. Additionally, the dispute here is between two private parties, while arbitration under bilateral investment treaties is typically between a private party and a state. *See* Lucas V.M. Bento, *The Globalization of Discovery: The Law and Practice Under 28 U.S.C. § 1782* 109 (2020) (discussing bilateral investment treaties and their interaction with § 1782(a), and noting that they are typically structured to resolve disputes in "investor-state" arbitrations).

Moreover, the ability of the parties to select their own arbitrators further suggests that CIETAC is a private arbitral body rather than a "foreign or international tribunal" under § 1782. To be sure, this factor is not determinative, as agreements between countries to arbitrate disputes between their citizens may involve selection of the arbitrators by the parties, and such a tribunal may be a "foreign or international tribunal" notwithstanding this fact. Nonetheless, in the circumstances of this case, the ability of parties to select their arbitrators is an additional indicator of the private status of CIETAC arbitration.

Considering the above, we are persuaded that CIETAC panels function in a manner nearly identical to that of private arbitration panels in the United States. As such, we conclude that CIETAC arbitration is best categorized as a private commercial arbitration for which § 1782 assistance is unavailable.

\*     \*     \*

As the Supreme Court has recognized, the current iteration of 28 U.S.C. § 1782(a) embodies the expanding aims of its enacting Congress. *Intel*, 542 U.S. at 257–58. Those aims included that the broad panoply of unilateral, multilateral, international, and novel administrative bodies created by governments in the wake of the Second World War should be provided with assistance in U.S. courts

commensurate with the assistance previously afforded to traditional foreign courts.  *See id.*   As we recognized in *NBC*, however, the statute does not sweep so broadly as to include private commercial arbitrations.   Because *NBC* remains good law following the Supreme Court's *Intel* decision, and because the CIETAC arbitration at issue in this case is a private commercial arbitration, Guo may not rely on § 1782 to request discovery.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of the petition.

26